No. 24-5430

# In the United States Court of Appeals for the Sixth Circuit

_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**JEFFREY YOUNG, JR.,**

**Defendant-Appellant.**

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE, D. CT. NO. 1:19-CR-10040 (HON. JOHN THOMAS FOWLKES, JR.)

_____

## ANSWERING BRIEF FOR THE UNITED STATES

_____

MATTHEW R. GALEOTTI
*Supervisory Official*

KATHERINE PAYERLE
*Deputy Chief*

ANDREW PENNEBAKER
*Trial Attorney*
*Criminal Division, Fraud Section*

JOSHUA K. HANDELL
*Attorney, Appellate Section*
*Criminal Division, Ste. 1515*
*United States Department of Justice*
*950 Pennsylvania Avenue N.W.*
*Washington, DC 20530*
*(202) 305-4244*
*joshua.handell@usdoj.gov*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................i

TABLE OF AUTHORITIES ..................................................................iii

STATEMENT REGARDING ORAL ARGUMENT ................................ vii

INTRODUCTION................................................................................... 1

STATEMENT OF THE ISSUES ............................................................. 2

STATEMENT OF THE CASE ................................................................ 2

      A.    Statement of Facts ........................................................... 2

      B.    Procedural History.......................................................... 10

      C.    Rulings Under Review..................................................... 12

SUMMARY OF ARGUMENT ............................................................... 12

ARGUMENT ...................................................................................... 14

      I.    Sufficient Evidence Established That Young Unlawfully Dispensed Controlled Substances to a Pregnant Patient.......................................... 14

      A.    Background..................................................................... 14

      B.    Standard of Review......................................................... 19

      C.    This Court Has Consistently Upheld CSA Convictions Predicated on the Same Type and Quantum of Evidence Adduced Below. ................................ 19

      D.    Young's Counterarguments Do Not Unsettle the Verdicts. ........ 25

      II.    Young's Status as a Medical Professional Did Not Deprive the District Court of Jurisdiction Over His Violations of the Controlled Substances Act. ...................................... 28

      A.    Background..................................................................... 28

B. Standard of Review.........................................................................30

C. Young's Challenge Does Not Implicate the District Court's Subject-Matter Jurisdiction. .............................................................31

D. Congress Has "Authorized" Medical Professionals to Prescribe and Dispense Controlled Substances Only for a Legitimate Medical Purpose in the Usual Course of Their Professional Practice........................................................................35

  1. Young's Interpretation of the Controlled Substances Act Is Foreclosed by Supreme Court Precedent. ...............35

  2. Questions of Judicial Deference to Agency Interpretations Have No Bearing on This Prosecution........................................................................41

CONCLUSION .........................................................................................48

SUPPLEMENTAL DESIGNATION OF DISTRICT COURT RECORD

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Auer* v. *Robbins*,
519 U.S. 452 (1997) ................................................................... 43

*Boyd* v. *United States*,
271 U.S. 104 (1926) ................................................................... 37

*Chevron U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ............................................................13, 29, 41

*Forest Grove Sch. Dist.* v. *T.A.*,
557 U.S. 230 (2009) ................................................................... 39

*Gonzales* v. *Oregon*,
546 U.S. 243 (2006) .............................................................40, 43, 44

*Gonzales* v. *Raich*,
545 U.S. 1 (2005) ................................................................. 37, 40

*Gundy* v. *United States*,
588 U.S. 128 (2019) ................................................................... 46

*Hrometz* v. *Loc. 550, Int'l Ass'n of Bridge Const. & Ornamental Ironworkers*,
227 F.3d 597 (6th Cir. 2000) ........................................................ 40

*Jin Fuey Moy* v. *United States*,
254 U.S. 189 (1920), overruled in part on other grounds by
*Funk* v. *United States*, 290 U.S. 371 (1933) ................................. 36, 37

*Kisor* v. *Wilkie*,
588 U.S. 558 (2019) ................................................................... 43

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin* v. *United States*,
367 F.3d 650 (7th Cir. 2004) ........................................................ 46

*Linder* v. *United States*,
268 U.S. 5 (1925) ..................................................................... 37

*Loper Bright Enterprises* v. *Raimondo*,
603 U.S. 369 (2024) ....................................................... 1, 13, 40, 41, 43

*Mallory* v. *Norfolk S. Ry. Co.*,
    600 U.S. 122 (2023) ................................................................ 40

*Nigro* v. *United States*,
    276 U.S. 332 (1928) .............................................................. 35, 38

*Rice* v. *Vill. of Johnstown, Ohio*,
    30 F.4th 584 (6th Cir. 2022) ................................................... 46

*Ruan* v. *United States*,
    597 U.S. 450 (2022) ......................................................... 33, 40, 45

*Rubin* v. *Islamic Republic of Iran*,
    830 F.3d 470 (7th Cir. 2016), aff'd, 583 U.S. 202 (2018) ............................................. 42

*Self-Ins. Inst. of Am., Inc.* v. *Snyder*,
    827 F.3d 549 (6th Cir. 2016) ................................................... 40

*United States* v. *Adesida*,
    129 F.3d 846 (6th Cir. 1997) ................................................... 32

*United States* v. *Anderson*,
    67 F.4th 755 (6th Cir. 2023) ........................................ 19, 20, 21, 22

*United States* v. *Anderson*,
    76 F.3d 685 (6th Cir. 1996) ................................................... 30

*United States* v. *Bacon*,
    884 F.3d 605 (6th Cir. 2018) ................................................... 30

*United States* v. *Behrman*,
    258 U.S. 280 (1922) .............................................................. 37

*United States* v. *Chaney*,
    921 F.3d 572 (6th Cir. 2019) ................................................... 23

*United States* v. *Cor-Bon Custom Bullet Co.*,
    287 F.3d 576 (6th Cir. 2002) ............................................... 33, 34

*United States* v. *Cotton*,
    535 U.S. 625 (2002) ......................................................... 30, 34

*United States* v. *Elliott*,
    876 F.3d 855 (6th Cir. 2017) ..................................... 19, 21, 22, 24, 44

*United States* v. *Fekete*,
535 F.3d 471 (6th Cir. 2008) ........................................................... 31

*United States* v. *Hamm*,
952 F.3d 728 (6th Cir. 2020) .......................................................... 30

*United States* v. *Hobbs*,
953 F.3d 853 (6th Cir. 2020) .......................................................... 34

*United States* v. *Lovern*,
590 F.3d 1095 (10th Cir. 2009) ...................................................... 45

*United States* v. *Marshall*,
248 F.3d 525 (6th Cir. 2001) ........................................................... 31

*United States* v. *Martin*,
526 F.3d 926 (6th Cir. 2008) ...................................................31, 32, 33

*United States* v. *Moore*,
423 U.S. 122 (1975) ......................... 1, 13, 21, 23, 24, 29, 35, 38, 39, 41, 42, 43, 46, 47

*United States* v. *Newsom*,
452 F.3d 593 (6th Cir. 2006) ...................................................... 31, 34

*United States* v. *Sawaf*,
129 F. App'x 136 (6th Cir. 2005) .............................................. 20, 21

*United States* v. *Smith*,
525 F. App'x 294 (6th Cir. 2013) ................................................... 31

*United States* v. *Volkman*,
736 F.3d 1013 (6th Cir. 2013), cert. granted, vacated on other grounds,
574 U.S. 955 (2014) .................................................................... 21

*United States* v. *Volkman*,
797 F.3d 377 (6th Cir. 2015) ......................................................... 44

*United States* v. *Watford*,
468 F.3d 891 (6th Cir. 2006) ......................................................... 40

*United States* v. *Woods*,
14 F.4th 544 (6th Cir. 2021) ......................................................... 19

*United States* v. *Word,*
  806 F.2d 658 (6th Cir. 1986) ........................................................... 24

*United States* v. *You,*
  74 F.4th 378 (6th Cir. 2023) ........................................................... 41

*Vanwinkle* v. *United States,*
  645 F.3d 365 (6th Cir. 2011) ..................................................... 32, 33

*W. Virginia* v. *Env't Prot. Agency,*
  597 U.S. 697 (2022) ........................................................................ 47

**Statutes and Rules**

18 U.S.C. § 1029 ............................................................................. 33

18 U.S.C. § 3231 ............................................................................. 31

21 C.F.R. § 306.04 (1973) ......................................................... 38, 43

21 C.F.R. § 1306.03 ........................................................................ 10

21 C.F.R. § 1306.04 .......................................... 10, 29, 35, 43, 44, 45, 48

21 U.S.C. § 821 ............................................................................... 47

21 U.S.C. § 822 ............................................................................... 10

21 U.S.C. § 841 ....................................................................... 2, 10, 39

21 U.S.C. § 846 ................................................................................. 2

21 U.S.C. § 856 ................................................................................. 2

21 U.S.C. § 861 ............................................................................ 2, 14

21 U.S.C. § 885 ............................................................................... 33

26 U.S.C. § 7201 ............................................................................. 33

36 Fed. Reg. 4948 (Mar. 13, 1971) .................................................. 45

Controlled Substances Act, Pub. L. No. 91-513, 84 Stat. 1236 (1970) .................. 37, 42

Harrison Anti-Narcotic Act, Pub. L. No. 63-223, 38 Stat. 785 (1914) .......................... 36

## STATEMENT REGARDING ORAL ARGUMENT

Given the novelty of certain theories advanced on appeal and the substantial sentence imposed below, the government respectfully suggests that oral argument may be helpful to the Court's disposition of this case.

## INTRODUCTION

Nurse-practitioner Jeffrey Young, Jr. ran an ostensible "family medicine" clinic that in fact served as a pill mill flooding his community with fentanyl, similar opioids, and other powerful and addictive controlled substances. Styling himself the "Rock Doc," Young flouted the critical safeguards imposed on such drugs and instead used his prescribing authority to accumulate cash, sexual favors, and local celebrity. A jury found him guilty on 15 counts related to his distribution of controlled substances.

Young now challenges (Br. 18-26) the sufficiency of the evidence underlying his convictions for dispensing controlled substances to a pregnant woman and disputes (Br. 26-47) the district court's subject-matter jurisdiction over this prosecution.

Young's first claim lacks merit. The evidence established that he prescribed large amounts of controlled substances to a patient he knew to be pregnant, increased her dosages without any legitimate medical justification, and ignored obvious signs of abuse and diversion. No reason exists to set aside the jury's findings.

Young's jurisdictional challenge likewise fails. At base, he asserts that licensed medical professionals enjoy blanket immunity from criminal liability under the Controlled Substances Act for even naked drug-dealing activity. The Supreme Court rejected that position in *United States* v. *Moore*, 423 U.S. 122 (1975), and its recent decision in *Loper Bright Enterprises* v. *Raimondo*, 603 U.S. 369 (2024)—overruling an agency-deference doctrine that postdated *Moore* by nearly a decade—cannot plausibly be read to unsettle that earlier precedent. This Court should affirm.

## STATEMENT OF THE ISSUES

1.      Whether sufficient evidence supported the jury's determination that Young unlawfully dispensed controlled substances to a pregnant woman.

2.      Whether the district court lacked subject-matter jurisdiction over this case on the theory that medical professionals are categorically immune from criminal liability under the Controlled Substances Act.

## STATEMENT OF THE CASE

Following a jury trial, defendant-appellant Jeffrey Young, Jr. was convicted on one count of conspiring to unlawfully distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C); six counts of unlawfully dispensing controlled substances to a pregnant woman, in violation of 21 U.S.C. § 861(f); seven counts of unlawfully dispensing controlled substances, in violation of 21 U.S.C. § 841(a)(1); and one count of maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1). Judgment, R. 343, PageID #5737-38. Young was sentenced to 240 months in prison, to be followed by six years of supervised release. *Id.* at #5739-40.

### A.      Statement of Facts

1.      Young, formerly a state-licensed nurse-practitioner, owned and operated the Preventagenix clinic in North Jackson, Tennessee. Trial Tr. (Day 2 A.M.), R. 275, PageID #3237. When it opened in 2014, Preventagenix was advertised as a "[f]amily medicine" clinic with a specialization in "heart- and stroke-prevention." *Id.* at #3238-

39.  That focus tracked Young's expertise, having previously "worked in a cardiology clinic" and done "speaking for heart and stroke prevention."  *Id.* at #3241.

Over time, however, Young shifted the clinic's practice to two entirely different specialties:  pain management and addiction treatment.  *See* Trial Tr. (Day 2 A.M.), R. 275, PageID #3239-40.  Young had no meaningful experience or qualifications in either area.  *See* Trial Tr. (Day 3 P.M.), R. 278, PageID #3674 (Young admitted that he did not have "any additional training in addiction medicine or pain management.").  Nor was his clinic equipped to serve those high-risk populations.  *See, e.g.*, Trial Tr. (Day 2 A.M.), R. 275, PageID #3348 (Young did not "have any addiction counselors on staff," did not "run a methadone program," and had never "take[n] any classes or special training for treating addiction"); Trial Tr. (Day 2 P.M.), R. 276, PageID #3474 (Young never "train[ed employees] in how to spot signs of addiction" or "how to counsel somebody that might be suffering from addiction" and did not have "an addiction counselor at the clinic.").

But the clinic's new specialties had one thing in common:  They appealed to patients who were dependent on opioids and other controlled substances.  Indeed, Young specifically targeted addicts in his advertising.  *See* Trial Tr. (Day 2 A.M.), R. 275, PageID #3348 ("Jeff would post on Facebook … if you have an addiction problem, contact me; I can help.").  Patients thereafter "came into the clinic to get help with [their] addiction issues"—notwithstanding the clinic's lack of resources in addiction treatment.  *Ibid.*  As recounted by a former employee, Young's philosophy about

3

controlled-substance users was "they're going to get the[ir drugs] somewhere, might as well be here."  Trial Tr. (Day 2 P.M.), R. 276, PageID #3462.

Young's clinic exploded in popularity.  "In the beginning"—when it was still focused on family/preventative medicine—Preventagenix "saw probably 15 to 25 patients a day."  Trial Tr. (Day 2 A.M.), R. 275, PageID #3240.  A year later, Young was seeing "40 to 55 [patients] a day"—primarily "younger people, 20s to 40s."  *Id.* at #3238, 3240-41.  And two years into its existence, the clinic was double- and triple-booking patients for the same slots; for example, on one "typical" day in 2017, Young had overlapping appointments with 68 patients, "[m]ost" of whom were "coming in to get a controlled[-substance] prescription."  *Id.* at #3305-06.  Indeed, "[s]ome days, … up to a hundred" patients visited Preventagenix, and roughly 80% of them obtained controlled substances.  Trial Tr. (Day 2 P.M.), R. 276, PageID #3462-64.

**2.**    To facilitate and maintain this high-volume operation, Young cut corners, fabricated records, intimidated employees, and lied to anyone who grew suspicious.

Although, as a nurse-practitioner, Young was authorized to prescribe only under the oversight of a supervising physician, he went significant periods without such a doctor in place.  Trial Tr. (Day 2 A.M.), R. 275, PageID #3350.  During these times, Young fraudulently used his former supervising physician's prescription pads.  *Ibid.*  He later devised a plan to "get[] a stamp with [his new supervising physician]'s name" because he "didn't want [the physician] to realize how many pain patients [Young] was seeing."  *Id.* at #3355-56; *see also id.* at #3357 (Young "use[d] Dr. Alston's stamp to

4

stamp the [patient] chart as if Dr. Alston was there and signed the chart."). And Young deliberately sought out physicians who would provide lax oversight. *See, e.g.*, *id.* at #3365-66 (Young described Dr. Rudin as "the perfect preceptor … [b]ecause he wasn't ever in the clinic, wasn't breathing down Jeff's neck, wasn't asking questions.").

Young also falsified records to conceal the clinic's activities. He routinely mischaracterized opioid recipients as "weight loss" patients to keep Preventagenix from being classified as a "pain clinic" subject to additional regulation. Trial Tr. (Day 3 A.M.), R. 277, PageID #3521-22; *see also* Trial Tr. (Day 3 P.M.), R. 278, PageID #3710 (Undercover investigator prescribed oxycodone was "classified as a weight-loss patient" despite having no weight-related problems and receiving no weight-related treatment.). For other patients—such as the "back-door patients" who paid cash or other favors for their prescriptions, *see infra* pp. 8-9—Young "didn't have charts at all." Trial Tr. (Day 2 P.M.), R. 276, PageID #3391. Asked to "grade the quality of Mr. Young's … record-keeping," an internal-medicine doctor retained as an expert gave Young an "F." Trial Tr. (Day 4 A.M.), R. 281, PageID #3867.

Beyond these paperwork deficiencies, Young failed to ensure that his patients needed the prescribed medications and knew the attendant risks. He prescribed one employee Xanax without an evaluation or diagnosis, leading her to "become addicted to Xanax while [she] worked at Preventagenix." Trial Tr. (Day 2 A.M.), R. 275, PageID #3342-43. When an undercover investigator visited the clinic posing as a patient, Young failed to ask even the most perfunctory questions before issuing her an opioid

prescription and a fentanyl patch. Trial Tr. (Day 2 P.M.), R. 276, PageID #3491-93. He prescribed another patient a fentanyl patch without telling her what it was, advising her of the side effects, or warning of its addictive potential. Trial Tr. (Day 3 A.M.), R. 277, PageID #3595-96. And when a state investigator visited the clinic, she found no evidence that Young had ever performed "psych evaluations for things like Xanax and Klonopin" or that "Young or anyone else at Preventagenix was educating patients about drug addiction." Trial Tr. (Day 3 P.M.), R. 278, PageID #3685, 3691.

Young further ignored unmistakable evidence that patients were abusing and diverting their medications. He did not "follow any consistent policy as patients came up with an inconsistent drug screen"; rather, "it varied patient to patient" and "mattered who it was that failed the drug screen." Trial Tr. (Day 2 P.M.), R. 276, PageID #3471. For example, when Young's "bodyguard" tested positive for drugs he had not been prescribed, clinic staff recommended that he be discharged and referred to a rehabilitation program, but Young "would just write him the prescription anyway after office hours, at home, meet him in the parking lot, whatever." Trial Tr. (Day 2 A.M.), R. 275, PageID #3325-26. One former patient—for whom Young prescribed oxycodone and fentanyl, Trial Tr. (Day 3 A.M.), R. 277, PageID #3592—recalled that she routinely failed the clinic's drug tests "because [she] knew [she] was getting stuff on the side that was different, but it was never brought up" and she "was never dismissed," *id.* at #3596-97. A patient's family even contacted Young, warning that their loved one was abusing her drugs and imploring him to discontinue his prescribing; he ignored

6

these entreaties. *See* Trial Tr. (Day 3 P.M.), R. 278, PageID #3749 (warning that if Young "write[s the patient] any more scripts, [he is] going to kill her" because he had been "giving her enough to kill a horse as many as she is eating, and there is nothing wrong with her"); *id.* at #3750 (asking Young to "wean [the patient] off or cut her off completely because she's running around here selling them like some kind of drug dealer and then runs out.").

Clinic employees suffered through Young's bouts of paranoia and intimidation. *See, e.g.*, Trial Tr. (Day 2 A.M.), R. 275, PageID #3266 (Young's text message to the "whole clinic": "Apparently we have a snake in the group, and I want you to know who the pot stirrer is."). As a former employee put it, "[i]f you weren't for him, you were automatically, in his eyes, against him, and he would make your life a living hell." *Id.* at #3345; *see also id.* at #3345-46 ("[H]e would just attack through himself, through his people, through social media[.] … I was followed. I was harassed. I was scared to go to the grocery store."). When employees expressed concerns, Young ordered his first office manager, Heather Goslee, to fire them. *Id.* at #3263. He later fired Goslee for sharing her own objections, *id.* at #3266-67, and sent her "cease and desist" letters warning her "not to contact the office staff," *id.* at #3288. Young maintained his same prescribing patterns notwithstanding staff concerns: As his second office manager, Kristie Gutgsell, recalled, "the staff would try to dismiss patients for one reason or another, and Mr. Young would continue prescribing to them or allow them to return." *Id.* at #3327; *see also ibid.* (When Gutgsell shared concerns with Young about a patient

abusing drugs, "[h]e wasn't surprised, and it was just a fleeting thought for him. He didn't really care one way or the other.").

**3.**    Young's no-questions-asked policy for controlled-substance prescriptions proved fantastically lucrative. He prescribed over 1.3 million controlled-substance pills and billed Medicaid nearly $4.2 million during the clinic's three-year lifespan. Trial Tr. (Day 3 P.M.), R. 278, PageID #3640-41, 3652. Nearly 75% of Young's Medicaid patients received controlled-substance prescriptions. *Id.* at #3646.

Aside from Medicaid, Young often conducted his business in cash. He set up a two-tiered system in which cash-paying "VIP" patients enjoyed priority access to Young and their own dedicated entrance to the clinic. Trial Tr. (Day 2 A.M.), R. 275, PageID #3312. And Young accepted cash even from patients who displayed obvious indicia of abusive and diversionary behavior. *See* Trial Tr. (Day 2 P.M.), R. 276, PageID #3499-3502 (Undercover agent told Young she had "com[e] from nearly two hours away to get controlled substances" but was allowed to pay cash for every visit.).

Young also maintained a separate cadre of "back-door patients" comprising, *inter alia*, "pretty women who were either sleeping with [Young] or attracted to [him] or [he] was attracted to." Trial Tr. (Day 2 A.M.), R. 275, PageID #3313-14. Young "would have sex with the[se patients] during the working day in his office" and then brag to his employees about the rendezvous. *Id.* at #3314-15. As recounted by Gutsgell, "[t]here was tap-that-ass Tuesday, tap-that-ass Thursday. … He would, after he was done, put his fingers in my face for me to smell." *Id.* at #3315. All the while, Young prescribed

controlled substances to patients with whom he was sexually involved. *Id.* at #3316-17; *see also* Trial Tr. (Day 3 P.M.), R. 278, PageID #3729-34 (one woman received 690 controlled-substance pills during her relationship with Young); *id.* at #3752-53 (Young prescribed to another woman while pressuring her into a sexual relationship). A state investigation later identified dozens of women who had "exchang[ed] explicit messages with [Young] while they're receiving prescriptions for opioids and other controlled drugs" under his authorization. Trial Tr. (Day 4 A.M.), R. 281, PageID #3795-96; *see, e.g.*, *id.* at #3788-90 (Young prescribed hydrocodone to a woman who sent him nude photographs.); *id.* at #3794-95 (Young prescribed alprazolam and hydrocodone to a different woman who sent him nude photographs).

In addition to sexual partners, Young used his prescribing authority to befriend "musicians, rock stars, [and] popular groups," Trial Tr. (Day 2 A.M.), R. 275, PageID #3313, as well as police officers who acted as unofficial "bodyguards," *id.* at #3318-21. Former employees recalled that Young "craved fame" and even "hired a producer and a film guy to come in and record his life" in furtherance of "a reality show" he wanted to pitch called "'Rock Doc.'" *Id.* at #3328-30. "The Rock Doc" was a "persona" Young began to act out at the clinic and on social media, *id.* at #3275-76, and he parlayed the resulting notoriety to exaggerate his credentials, *id.* at #3329, and enlist additional women willing to trade sexual favors for prescriptions, *see* Trial Tr. (Day 3 P.M.), R. 278, PageID #3761, 3779; Trial Tr. (Day 4 A.M.), R. 281, PageID #3779.

**B.    Procedural History**

**1.**      In 2019, a grand jury in the Western District of Tennessee indicted Young on 15 counts related to his distribution of controlled substances at Preventagenix. Indictment, R. 4, PageID #19-33; *see supra* p. 2.

All charges arose from the Controlled Substances Act (CSA), 21 U.S.C. ch. 13. The CSA provides that, "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally … to manufacture, distribute, or dispense … a controlled substance." 21 U.S.C. § 841(a). The relevant "authoriz[ation]" is explained in Section 822(a)(2), which requires "[e]very person who dispenses … any controlled substance" to "obtain from the Attorney General a registration issued in accordance with the rules and regulations promulgated by him."

The Attorney General has, in turn, promulgated a set of regulations governing the dispensation of controlled substances. *See generally* 21 C.F.R. part 1306. As relevant here, 21 C.F.R. § 1306.03 stipulates that "[a] prescription for a controlled substance may be issued only by an individual practitioner who is … [a]uthorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession." And 21 C.F.R. § 1306.04 provides that "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."

The indictment thus alleged that Young "issued prescriptions for controlled substances … outside the course of [his] professional practice and without a legitimate

10

medical purpose." R. 4, PageID #19.  The grand jury elaborated, *inter alia*, that Young's "motives in prescribing controlled substances to his patients were often to obtain money, notoriety, and sexual favors," *ibid.*; that he "intentionally ignored the State's guidelines for prescribing controlled substances," *id.* at #27; that he "knowingly and intentionally ignored the inherent risks of overdose, drug abuse, and death," *ibid.*; and that he "prescribed to pregnant patient H.R., Hydrocodone, Oxycodone, and Alprazolam, for no legitimate medical purpose and outside the course of professional conduct," causing "H.R.'s baby [to be] born addicted to opioids," *ibid.*

    **2.**      Young pleaded not guilty, and the case proceeded to trial.

The government called 12 witnesses, including former clinic employees and patients (such as Hope Rogers[1], who was under Young's care while she was pregnant); undercover investigators and other law-enforcement agents; and Dr. Tricia Aultman, a physician who testified as an expert "in the field of internal medicine, including the professional practice and legitimate medical purpose of prescribing opioids … and other controlled substances," Trial Tr. (Day 4 A.M.), R. 281, PageID #3864.

Young unsuccessfully moved for a judgment of acquittal after the government rested, Trial Tr. (Day 4 P.M.), R. 282, PageID #3972-76, and declined to put on a separate defense case, *id.* at #3990.  The jury found him guilty on all counts.  Verdict, R. 285, PageID #4031-34.

---

[1] At trial, Rogers used the surname Arment.  Because most record documents and Young's brief (*see* Br. 7 n.1) use "Rogers," the government does the same.

### C.    Rulings Under Review

Young challenges the district court's denial of his motion for a judgment of acquittal as to Counts 2-7, Trial Tr. (Day 4 P.M.), R. 282, PageID #3982 (Br. 18-26); and its denial of his post-verdict motion to dismiss the indictment for lack of subject-matter jurisdiction, R. 341, PageID #5724-28 (Br. 26-47).

## SUMMARY OF ARGUMENT

**I.**    Ample evidence supported Young's convictions for unlawfully dispensing controlled substances to a pregnant woman.  Young does not contest that he prescribed powerful and addictive controlled substances to a patient whom he knew to be pregnant at the time.  Although Young contends he did so for a legitimate medical purpose in the ordinary course of professional practice, the trial evidence established that he prescribed unreasonable amounts of controlled substances, increased his patient's dosages over time without a medical justification, and ignored red flags of abuse and diversion—all of which serve as hallmarks of illegitimate medical practice under the Controlled Substances Act and this Court's case law.  The jury thus rationally determined that Young knowingly dispensed controlled substances to a pregnant patient outside the course of his professional practice and for no legitimate medical purpose.  No reason exists to set aside their verdicts.

**II.**    Because the grand jury appropriately charged him with criminal violations of federal statutes, Young's challenge to the court's subject-matter jurisdiction fails at the threshold.  As this Court has emphasized, a dispute as to the metes and bounds of

offense elements may support claims that the indictment was inadequate, the jury instructions were incorrect, or the evidence was insufficient—but it does not deprive the district court of power to adjudicate the case.  And, because Young neither preserved below nor presented on appeal a non-jurisdictional challenge to the indictment, instructions, or proof, he has waived any such claim before this Court.

At all events, Young's claim fails on the merits.  Congress did not grant licensed medical professionals blanket immunity to deal drugs for no legitimate medical purpose.  This commonsense understanding of the Controlled Substances Act extends back at least half a century, since the Supreme Court expressly "h[e]ld that registered physicians can be prosecuted under [Section] 841 when their activities fall outside the usual course of professional practice."  *United States* v. *Moore*, 423 U.S. 122, 124 (1975).

Nothing in *Loper Bright Enterprises* v. *Raimondo*, 603 U.S. 369 (2024), undermines that precedent.  *Moore*—which was decided nine years before *Chevron U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)—did not apply the yet-to-be-invented *Chevron* doctrine or reflect any other species of agency deference.  To the contrary, the Court surveyed the text, structure, history, and purpose of the CSA and identified "the clear intent of the Congress" to include illegitimate medical practice within the ambit of criminal liability under that statute, *Moore*, 423 U.S. at 145—a prototypical exercise of "the judicial role … to 'interpret the act of Congress,'" *Loper Bright*, 603 U.S. at 385, that is fully consistent with modern Supreme Court precedent.

13

**ARGUMENT**

## I.    Sufficient Evidence Established That Young Unlawfully Dispensed Controlled Substances to a Pregnant Patient.

Of his 15 counts of conviction, Young contests (Br. 18-26) the sufficiency of the evidence as to just Counts 2-7, alleging unlawful dispensation of controlled substances to his then-pregnant patient Hope Rogers, in violation of 21 U.S.C. § 861(f).  Section 861(f) makes it "unlawful for any person to knowingly or intentionally provide or distribute any controlled substance to a pregnant individual" unless authorized under the CSA—in other words, unless dispensed pursuant to a prescription "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  *See supra* pp. 10-11.

Young does not dispute that he prescribed controlled substances to Rogers while she was pregnant, nor does he deny that he knew she was pregnant at the time.  *See infra* pp. 14-16.  His only contention (Br. 19) is that his "dispensing of these drugs was not outside the course of professional measures and w[as] for a legitimate medical need of the patient."  The jury acted well within its province when it rejected that defense.

### A.    Background

**1.**    Former Preventagenix patient Hope Rogers testified at trial.  *See* Trial Tr. (Day 2 P.M.), R. 276, PageID #3404-59.  She recalled that she first saw Young in November 2014, and he thereafter prescribed her "Ambien, Lortab, … Percocet, … Xanax and Seroquel."  *Id.* at #3408.  Rogers had received some pain-management

14

medications from her previous doctor, and she described how that doctor's care "was

different" from Young's:

> Every month you got a pill count, you got random drug tests. Like, [the previous physician] knew about my drug addiction. Like, he had asked those questions because he kind of knew about my family history, I guess. But he asked at the beginning before I started the pain management: Do you have any problems with addiction or have had in the past. I told him yes. So he would actually, like, call me in for random drug tests and things of that nature to keep me—I guess, keep me accountable.

*Id.* at #3411. At Young's practice, by contrast, Rogers found it easy to cheat on drug

tests without consequence: "Either I was having someone … pee for me and carrying

it in, or I was adding the medicine in the bathroom." *Id.* at #3411-12. Although clinic

staff flagged Rogers's aberrant test results, Young ignored their concerns, continued

prescribing her controlled substances, and increased her dosages over what her previous

doctor had prescribed. *Id.* at #3412-14.

About two months after she began seeing Young, Rogers became pregnant with

a daughter, A. Trial Tr. (Day 2 P.M.), R. 276, PageID #3413. Rogers testified that she

informed Young of her pregnancy at her first clinic visit after finding out, around

February 2015. *Id.* at #3416. By that point, Young had increased Rogers's dosages,

and she was struggling with addiction. *Id.* at #3414. ("[M]y dosage had went up on my

pills. My amount had went up on my pills, and I had a little bit more freedom with

them. So, yes, I would definitely say that my addiction was active at that time."). She

testified that she did not need such high quantities of pain medication—recalling that

she was experiencing only "pregnant woman aches and pains, the normal stuff," *id.* at

15

#3420—and would have acceded if Young had tried to wean her off opioids in light of the pregnancy risk they posed, *id.* at #3422. But "that never happened," *ibid.*; indeed, Rogers had no recollection of Young "ever tell[ing her] about the risks of being on opioids while [she was] pregnant" and thus did not "know the risks of what it does to a fetus to be addicted to opioids or Xanax." *Id.* at #3416.

Rogers admitted that she had misused controlled substances throughout her pregnancy: She was "failing drug tests," "crushing up pills," and abusing and diverting the medications Young had prescribed her "while [she] was pregnant with A. … [a]nd after." Trial Tr. (Day 2 P.M.), R. 276, PageID #3431-32. But she relied on Young's inaction in the face of these "red flag[s]" as implicit approval:

> [W]hen the drug tests came back, that was an all-points bulletin, red flag, ding, ding, ding, ding, ding, something is wrong, she's not taking her medicine like she's supposed to. And the way I looked at it was, if he's my doctor or my friend, he would see that something is going on. And, clearly, it's not as bad as other people are telling me it is if he's not saying anything about it.

*Id.* at #3449. Rogers's daughter A. was born in August 2015 with opioids in her system and had to be admitted to the neonatal intensive-care unit. *Id.* at #3430.

**2.** The government also called Dr. Tricia Aultman, a doctor of internal medicine, as its expert witness in the prescribing of opioids, benzodiazepines, and other controlled substances. Trial Tr. (Day 4 A.M.), R. 281, PageID #3862-64. In addition to her general assessment that Young's manner of "distributing opioids" was "way

outside what a legitimate medical visit would be," *id.* at #3865, Dr. Aultman also reviewed Young's course of conduct with respect to Rogers.

Dr. Aultman explained that "opioids are not … a drug of choice in pregnancy in any way" and are "supposed to be used only if absolutely necessary" to avoid "neonatal abstinence syndrome, which is basically withdrawal in the newborn." Trial Tr. (Day 4 P.M.), R. 282, PageID #3911. Accordingly, "the standard of care, if [a patient] is on opioids, is to switch them to either methadone or Suboxone" when she becomes pregnant, which is "safer for the mom, and … safer for the baby." *Ibid.* Nevertheless, Dr. Aultman found that Young had not only kept Rogers on opioids throughout her time as a patient but in fact repeatedly increased the dosage and potency of her prescriptions with no legitimate medical justification. *See id.* at #3908 ("[W]ith no clear reason that I can understand, he's increased her opioid dose on the first visit and increased the benzodiazepine dose as well."); *id.* at #3908-09 (observing that Young "discontinue[d] what [Rogers's] last doctor was doing" by "stopp[ing] the Tylenol 3" and "start[ing] something stronger"); *id.* at #3910 (noting that Young switched Rogers's prescription "from hydrocodone 7.5 milligrams to Percocet 7.5 milligrams," with the latter being "1.5 times as strong as hydrocodone"). Dr. Aultman concluded that Young was "putting both the patient at risk increase for overdose" and "the child at risk for worsening neonatal abstinence syndrome." *Id.* at #3915.

Dr. Aultman also testified that Young transgressed the bounds of professional practice by ignoring pervasive indicia that Rogers was diverting and abusing her

medications.  She observed that Rogers tested for a "very high" level of oxycodone in her system while pregnant despite not being on an active oxycodone prescription; in Dr. Aultman's view, "the appropriate thing to do" in response to that test result "would be to put her on Suboxone or methadone or refer her to someone that would because she's got a problem"—but Young kept prescribing her controlled substances instead. Trial Tr. (Day 4 P.M.), R. 282, PageID #3920-21.  When asked whether "any prescriptions written to [Rogers] during this time [would] be consistent with the ordinary course of professional practice for a legitimate medical purpose," Dr. Aultman said "[d]efinitely not" because Rogers was "clearly abusing, diverting, selling … her medicine" and "not taking it in the prescribed manner."  *Id.* at #3924-25.

**3.**     After the government rested, Young moved for a judgment of acquittal on Counts 2-7 on the grounds that there was "no allegation that [Young] was trying to sleep with [Rogers]" and that "other physicians [were also] prescribing her hydrocodone."  Trial Tr. (Day 4 P.M.), R. 282, PageID #3974.  In response, the government cited Dr. Aultman's opinion that the "prescriptions that are charged in the indictment were issued outside the scope of professional practice without a legitimate medical purpose," as well as Rogers's "testi[mony that] she didn't need those drugs." *Id.* at #3978-79.

The district court denied Young's motion.  Trial Tr. (Day 4 A.M.), R. 282, PageID #3980.  The court noted that Dr. Aultman "was unequivocal that the way … Ms. Rogers was treated was definitely outside the course of professional practice." *Id.*

at #3982. The court elaborated that "[t]he testimony about the [prescriptions] that were given to Rogers specifically while she was pregnant" established that they were "outside that scope, and … could lead to criminal responsibility." *Ibid.*

### B.    Standard of Review

This Court "review[s] a challenge to the sufficiency of the evidence in a criminal case de novo," viewing "the evidence in the light most favorable to the government and … affirm[ing] a defendant's conviction if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States* v. *Woods*, 14 F.4th 544, 555 (6th Cir. 2021).

### C.    This Court Has Consistently Upheld CSA Convictions Predicated on the Same Type and Quantum of Evidence Adduced Below.

This Court's decisions have recognized several categories of evidence that are independently sufficient to sustain CSA convictions of prescribers. Each of those categories, whether considered individually or collectively, supports the jury's guilty verdicts on Counts 2-7.

1.    <u>Expert Testimony.</u> Although "expert testimony is not required," *United States* v. *Elliott*, 876 F.3d 855, 864 (6th Cir. 2017), this Court has repeatedly affirmed CSA convictions based on expert testimony regarding the defendant's failure to comply with the standards of professional practice. In *United States* v. *Anderson*, 67 F.4th 755, 760 (6th Cir. 2023), for example, this Court found sufficient evidence based in large part on "expert testimony on 'whether [the defendant]'s medical records are consistent

with the usual course of medical practice and whether the prescribing of controlled substances by [the defendant] was for legitimate medical purposes.'" The expert "observed that [the defendant] frequently failed to establish an objective and legitimate pain diagnosis, perform a physical examination, put together an appropriate treatment plan accounting for a patient's comorbidities, and enforce compliance measures." *Id.* at 769. This testimony "established that [his] prescribing practices fell far short of professional practice." *Ibid.*; *see also Elliott*, 876 F.3d at 864 ("[E]xpert testimony offered additional evidence to distinguish [the defendant]'s actions from those of an ordinary doctor."); *United States* v. *Sawaf*, 129 F. App'x 136, 142 (6th Cir. 2005) (unpublished) ("A reasonable trier of fact could conclude, based on [the expert]'s testimony, that Defendant wrote or approved prescriptions without a legitimate medical purpose.").

The same outcome is warranted here. As discussed *supra* pp. 16-18, Dr. Aultman reviewed Rogers's treatment history and testified that Young's prescriptions for his pregnant patient fell outside the accepted bounds of medical practice. *See* Trial Tr. (Day 4 P.M.), R. 282, PageID #3912 (Q: "Did you see anything at all in Ms. Rogers' chart that would indicate that this prescription for Percocet or oxycodone was written within the ordinary course of professional practice for a legitimate medical purpose?" A: "No, and she was pregnant, and it would be contraindicated, to be honest."); *id.* at #3917 (Q: "[W]ere these prescriptions [for Xanax and Lortab], either one of them, written in the ordinary course of professional practice for a legitimate medical purpose?" A: "No, and they were dangerous for the patient and the baby."); *id.* at #3924-25 (Q: "Would

any prescriptions written to her during this time be consistent with the ordinary course of professional practice for a legitimate medical purpose?"  A: "Definitely not. She's clearly abusing, diverting, selling, doing something with her medicine, but she's not taking it in the prescribed manner.").  As in *Anderson*, *supra*, the jury was well within its province to credit those expert opinions and find that Young's prescriptions were not issued for a legitimate medical purpose in the usual course of professional practice.

**2.**    Inattention to Medical Needs.  In its seminal decision upholding a doctor's conviction under the CSA, the Supreme Court found notable that the doctor "gave inadequate physical examinations or none at all" before issuing controlled-substance prescriptions.  *United States* v. *Moore*, 423 U.S. 122, 142 (1975).  This Court has likewise found sufficient evidence where "[p]hysical examinations were either infrequent, cursory, or non-existent," *Anderson*, 67 F.4th at 769; where jurors "heard about the extremely short time [the doctor] spent with patients," *Elliott*, 876 F.3d at 864; and where the "[d]efendant did not always conduct exams before issuing prescriptions," *Sawaf*, 129 F. App'x at 142.  This Court has similarly deferred to a jury's assessment that a medical professional violated the limits of professional practice by prescribing controlled substances in clear disregard of patient-specific risk factors.  *See, e.g.*, *Anderson*, 67 F.4th at 769 (defendant failed to "account[] for a patient's comorbidities"); *United States* v. *Volkman*, 736 F.3d 1013, 1026 (6th Cir. 2013) (noting that the patient "was already at risk of breathing difficulties, and [the] drug cocktail exposed her to a greater risk of death"), cert. granted, judgment vacated on other grounds, 574 U.S. 955 (2014).

The trial evidence documented those same deficiencies in Young's treatment of Rogers. Rogers noted Young's treatment "was different" from that of her previous physician—who rigorously enforced "random drug tests and things of that nature to … keep [her] accountable"—and that she had "more freedom with" the pills she received from Young's clinic. Trial Tr. (Day 2 P.M.), R. 276, PageID #3411, 3414. Other patients similarly testified that Young issued prescriptions to them without examinations, diagnoses, or warnings. *See supra* pp. 5-6. Although the record discloses little about what (if any) examinations Young conducted of Rogers, she recalled that she suffered only from "pregnant woman aches and pains, the normal stuff," rather than any ailments that would require the powerful and addictive drugs Young prescribed. Trial Tr. (Day 2 P.M.), R. 276, PageID #3420. And Rogers testified that Young failed to advise of the risks—to both her and her unborn daughter—associated with the prescribed drugs. *See id.* at #3416, 3450 ("I have never … been told what opioids or Xanax do to an infant.").

3.  Ignoring Red Flags. This Court's decisions frequently cite evidence documenting the medical professional's deliberate indifference to indicia of abuse and diversion. Such red flags include prescribing to patients who display obvious drug-seeking behavior. *See, e.g., Anderson*, 67 F.4th at 769 ("[T]wo of [the defendant]'s former patients … testified that they either showed signs of or admitted to addiction when they came to him asking for pain medications."); *Elliott*, 876 F.3d at 864 ("The jury also heard about … [the defendant's] knowledge of the distances [patients] traveled to obtain

prescriptions at the clinic."). And juries may permissibly infer intentional unlawful distribution when medical professionals disregard aberrant test results. *See, e.g.*, *Moore*, 423 U.S. at 143 (noting that the defendant "ignored the results of the tests he did make … and took no precautions against [the medication's] misuse and diversion"); *United States* v. *Chaney*, 921 F.3d 572, 591 (6th Cir. 2019) ("[A] former patient … testified that he was prescribed Percocet on his first visit to the clinic; … that after a drug screening was negative for opiates, he told [the defendant] he was only taking drugs as needed," but that the defendant nevertheless "*increased* the dosage of [his] prescription after [the] drug screening was negative.").

So too here. Rogers testified that she was "failing drug tests" and "crushing up pills to try to have th[em] in [her] system" for the entire time she was under Young's care, including throughout her pregnancy. *See* Trial Tr. (Day 2 P.M.), R. 276, PageID #3431-32. When her drug tests failed to show the metabolites from properly ingested pills, a nurse "called [her] into the room" and "told [her] that they could no longer see [her]" at the clinic. *Id.* at #3412. But Young overruled the nurse; he "came in and looked at [the test results] and just told [the nurse] to put me in a room. And then I didn't hear anything else about those drug tests." *Ibid.* Rogers later acknowledged that, "when the drug tests came back, that was an all-points bulletin, red flag, ding, ding, ding, ding, ding, something is wrong, she's not taking her medicine like she's supposed to." *Id.* at #3449. The government's expert, Dr. Aultman, agreed. *See* Trial Tr. (Day 4 P.M.), R. 282, PageID #3924-25. And evidently, so did the jury.

23

**4.** <u>Unreasonable Dosages.</u>  Both this Court and the Supreme Court have held that an unreasonably high quantity of prescribed medications can alone support the inference that the defendant acted outside the usual course of his professional practice and not for a legitimate medical purpose.  *See, e.g.*, *Moore*, 423 U.S. at 143 (Defendant "did not regulate the dosage at all, prescribing as much and as frequently as the patient demanded."); *Elliott*, 876 F.3d at 864 (Defendant "prescribed opioids in doses generally not found outside patients with traumatic injuries or in end-of-life care."); *United States* v. *Word*, 806 F.2d 658, 663 (6th Cir. 1986) ("The lay testimony clearly established that defendant prescribed great quantities … for large sums of money.").

The evidence amply supported such an inference here.  After reviewing Rogers's prescription history, Dr. Aultman concluded that Young was "putting both the patient at risk increase for overdose" and "the child at risk for worsening neonatal abstinence syndrome" through the copious controlled substances he prescribed.  Trial Tr. (Day 4 P.M.), R. 282, PageID #3915.  Rogers agreed that Young's large quantities and lax oversight gave her "freedom with [her pills]" during her pregnancy, causing her "addiction [to be] active at that time."  Trial Tr. (Day 2 P.M.), R. 276, PageID #3414.  Finally, the evidence established Young's subjective awareness that he had prescribed unsafe dosages to Rogers:  In April 2015, he texted a friend that "pregnant people [should not] have Xanax" due to the risk of "harm[ing] the baby," Trial Tr. (Day 4 A.M.), R. 281, PageID #3839—but proceeded to prescribe over 300 Xanax pills to a pregnant Rogers in the months *after* that admission, *id.* at #3844-45.

This case was not a close call. Each category of proof—Dr. Aultman's expert testimony, Young's demonstrable inattention to his patients' legitimate medical needs, his disregard of Rogers's abuse and diversion, and the uncontroverted evidence of his overprescribing—independently supported the inference that Young knowingly dispensed controlled substances to his pregnant patient beyond the bounds of legitimate medical practice. This Court should affirm the jury's verdicts.

### D.    Young's Counterarguments Do Not Unsettle the Verdicts.

In the face of this abundant evidence, Young asserts (Br. 18-26) that he cannot be faulted for his prescriptions because (1) Rogers was already taking controlled substances when she became Young's patient, and (2) other physicians were involved in her care during her pregnancy and did not intervene. The jury had every reason to reject these defenses.

**1.**    Young's repeated invocations (Br. 20, 23, 25) of the judgment exercised by Rogers's previous physician are neither supported by the record nor relevant to his own liability. Although Rogers was already on a pain-management regimen when she came to Young's clinic, she testified about how "it was different" under the care of her previous doctor, who rigorously enforced "random drug tests" to "keep [her] accountable." Trial Tr. (Day 2 P.M.), R. 276, PageID #3411. And the jury heard unrebutted testimony that Young immediately—and with no legitimate medical justification—"discontinue[d] what [Rogers's] last doctor was doing" in favor of more potent opioids. Trial Tr. (Day 4 P.M.), R. 282, PageID #3908-09; *see also id.* at #3908

("[W]ith no clear reason that I can understand, he's increased her opioid dose on the first visit and increased the benzodiazepine dose as well."); *id.* at #3910 (noting that Young switched Rogers's prescription to Percocet, which is "1.5 times as strong as [her previous] hydrocodone [prescription]"); Trial Tr. (Day 2 P.M.), R. 276, PageID #3414 (Rogers recalling that her "dosage had went up on [her] pills.").

In any event, even if Young had simply maintained the same medications Rogers was previously prescribed, a rational jury could still have found that conduct to fall outside the usual course of professional practice. As a former supervising physician testified, each medical professional is "obligated to make [his] own judgment about treatment and necessity." Trial Tr. (Day 3 A.M.), R. 277, PageID #3585. Dr. Aultman agreed that it is not "within the scope of professional [practice] to just prescribe whatever the last doctor prescribed and call it a day" and that a medical professional must "make [his] own independent evaluation." Trial Tr. (Day 4 A.M.), R. 281, PageID #3886. That conclusion has even more force where, as here, a significant intervening development—Rogers's pregnancy—should have triggered a reevaluation of her treatment regimen. *See* Trial Tr. (Day 4 P.M.), R. 282, PageID #3911 ("[T]he standard of care, if someone is on opioids [and becomes pregnant], is to switch them to either methadone or Suboxone.").

**2.** Young's attempts to shift blame onto other members of Rogers's "medical team" fare no better. Upon learning she was pregnant, Rogers saw her obstetrician Dr. Walker, who referred her to a "high-risk doctor," Dr. Hoeldke. Trial Tr. (Day 2 P.M.),

26

R. 276, PageID #3415-16.  Young asserts (Br. 24)—without record citation—that "[t]he high-risk OB was aware of all of the prescriptions that Mr. Young was prescribing Ms. Rogers" and implies that Dr. Hoeldke's failure to countermand Young's prescriptions undermines the jury's verdicts.

The jury had multiple reasons to reject this defense.  As noted, each medical professional is "obligated to make [his] own judgment about treatment and necessity," Trial Tr. (Day 3 A.M.), R. 277, PageID #3585, so Young cannot rely on the approval of another doctor—much less an implied approval purportedly conveyed through silence and inaction—to immunize his prescribing practices.  Moreover, although the record does not reveal the full breadth of Dr. Hoeldke's knowledge, the jury had good reason to doubt that he understood the extent to which Young was feeding Rogers's addiction:  For instance, when Rogers experienced gastrointestinal distress (which she later attributed to "withdrawals because [she] had been out of [her] medicine for about a week"), Dr. Hoeldke urged her to "see … [her] GI doctor" or "go to the emergency room"; Young, in contrast, immediately recognized the symptoms as opioid withdrawal and refilled her prescription.  Trial Tr. (Day 2 P.M.), R. 276, PageID #3417-18; *cf.* Trial Tr. (Day 4 A.M.), R. 282, PageID #3876 (Dr. Aultman opining that it is not "a legitimate medical purpose of opioids to … get somebody through withdrawals or detox").

Finally, Young notes (Br. 24) that the "emergency room physicians … also prescrib[ed Rogers] opioids" despite "knowing she was on Xanax."  Once again, the fact that some other doctors may have issued the same prescription does not immunize

Young's conduct—particularly when those doctors lacked Young's familiarity with Rogers's history of addiction and indicia of diversion and abuse.  In any event, Dr. Aultman explained that there could be "a legitimate medical reason why a doctor may prescribe hydrocodone for a couple of days while a patient in preterm labor is in the hospital," but this time-limited, circumstance-specific rationale "d[id] not change [her] opinion" as to whether Young's "*ongoing* and *increasing* prescriptions of hydrocodone alongside Xanax were for a legitimate medical purpose and within the course of professional conduct."  Trial Tr. (Day 4 P.M.), R. 282, PageID #3970 (emphases added).  The jury was well within its province to credit that testimony.

## II. Young's Status as a Medical Professional Did Not Deprive the District Court of Jurisdiction Over His Violations of the Controlled Substances Act.

Young next contends (Br. 26-47) that the district court lacked jurisdiction over this case on the theory that licensed medical professional cannot be prosecuted for issuing controlled-substance prescriptions.  That contention is wrong twice over: Young's assertion of immunity from criminal liability (1) casts no doubt on the court's subject-matter jurisdiction over alleged violations of federal law and (2) finds no support in the CSA and its interpretive caselaw.

### A. Background

In March 2024—nearly five years after he was indicted, a year after the trial, and three days before sentencing—Young moved to dismiss the indictment for lack of subject-matter jurisdiction.  R. 333, PageID #5625-72.  Young argued that, "because

28

[he] was properly licensed … [to] prescribe scheduled narcotics … he was 'authorized' to prescribe controlled substances pursuant to 21 U.S.C. § 841(a)" and thus could not be criminally liable. *Id.* at #5626. Moreover, because—in addition to provisions of the CSA—the indictment also referenced implementing regulations, Young argued that the government had impermissibly "imposed qualifying conditions on the definition of 'authorized'" that "are not codified" in the statute. *Id.* at #5627; *see* Indictment, R. 4, PageID #22-23 (quoting 21 C.F.R. § 1306.04(a)). To the extent such regulations may have been entitled to deference under *Chevron U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.,* 467 U.S. 837 (1984), Young asked the court to overlook that precedent, which he characterized as "on the brink of extinction." Mot. to Dismiss, R. 333, PageID #5659.

The government opposed Young's motion, arguing that the Supreme Court had already "said that, in fact, doctors can be prosecuted … for not practicing medicine but rather for distributing drugs outside the course of their professional practice." Sent. Tr., R. 349, PageID #5848-49 (citing *Moore*, 423 U.S. 122); *see also id.* at #5858 ("*Moore* established that it's perfectly okay for it to be the provinces of judges and juries … to decide what legitimate medical practice looks like.").

The district court "disagree[d] with [Young]'s argument." Sent. Tr., R. 349, PageID #5850. The court expressed skepticism "that *Chevron* deference has anything to do with this" case and relied instead on *Moore*, which "ruled[,] prior to … *Chevron*[,] that doctors could be prosecuted." *Ibid.* The court thus denied Young's motion, *id.* at #5851, and later confirmed that denial in a written order, R. 341, PageID #5724-28.

**B.    Standard of Review**

The applicable standard depends on whether this Court agrees with Young (Br. 26-27) that this challenge implicates the district court's subject-matter jurisdiction or instead with the government (*see infra* pp. 31-34) that Young's contentions are better understood as unpreserved and undeveloped objections to the adequacy of the indictment, the correctness of the jury instructions, and the sufficiency of the evidence.

**1.**    "'Questions of subject matter jurisdiction are questions of law that are reviewed de novo.'" *United States* v. *Bacon*, 884 F.3d 605, 608 (6th Cir. 2018). "[B]ecause it involves a court's power to hear a case," a challenge to subject-matter jurisdiction "can never be forfeited or waived." *United States* v. *Cotton*, 535 U.S. 625, 630 (2002).

**2.**    "In contrast, the grand jury right can be waived." *Cotton*, 535 U.S. at 630. So can challenges to the jury instructions and the sufficiency of the evidence on a particular element. *See United States* v. *Anderson*, 76 F.3d 685, 689 (6th Cir. 1996) (A "defendant waive[s] his right to appeal the jury instructions by not making a contemporaneous objection."); *United States* v. *Hamm*, 952 F.3d 728, 740 (6th Cir. 2020) ("'Although specificity of grounds is not required in a Rule 29 motion, where a Rule 29 motion is made on specific grounds, all grounds not specified are waived.'").

When a claim was not preserved below, it is reviewable, at most, for plain error—requiring the defendant to carry the burden as to each of "four inquiries: (1) whether an error actually occurred in the district court, (2) the obviousness of that error, (3) whether the error affected substantial rights, and (4) whether the compromise of

substantial rights seriously affected the fairness, integrity or public reputation of judicial proceedings." *United States* v. *Marshall*, 248 F.3d 525, 535 (6th Cir. 2001). Where a defendant "does not attempt to explain how" an unpreserved objection "constitutes … plain error under the standard applicable to such a forfeited claim," the "absence of this briefing weighs against reviving this forfeited issue." *United States* v. *Smith*, 525 F. App'x 294, 297 (6th Cir. 2013) (unpublished). And, of course, "'[a]n appellant abandons all issues not raised and argued in [his] initial brief on appeal.'" *United States* v. *Newsom*, 452 F.3d 593, 607 (6th Cir. 2006); *see also United States* v. *Fekete*, 535 F.3d 471, 482 (6th Cir. 2008) ("[A]rguments referred to in a perfunctory manner and unaccompanied by some effort to develop argumentation are deemed waived.").

## C. Young's Challenge Does Not Implicate the District Court's Subject-Matter Jurisdiction.

Young's theories about the appropriate application of the CSA to medical professionals do not impugn the court's subject-matter jurisdiction. District courts have original jurisdiction to adjudicate "all offenses against the laws of the United States." 18 U.S.C. § 3231. To show that the district court lacked jurisdiction, then, Young must "establish that the face of the indictment failed to charge the elements of a federal offense." *United States* v. *Martin*, 526 F.3d 926, 934 (6th Cir. 2008).

He has not attempted to make such a showing—nor could he do so. The indictment correctly stated, *inter alia*, that "the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance,"

R. 4, PageID #20, and it alleged that Young knowingly violated that prohibition through various factual means across the 15 charged counts, *id.* at #25-32. No more was required to establish jurisdiction. *See Vanwinkle* v. *United States*, 645 F.3d 365, 369 (6th Cir. 2011) ("The indictment properly charged [the defendant] with violations of [statutes], all of which are cognizable federal offenses over which the district court had subject matter jurisdiction. Accordingly, the jurisdiction challenge is unpersuasive.").[2]

On appeal, Young has advanced an argument as to why the government cannot establish an actionable violation of the CSA on the facts presented here. But that contention sounds in the government's ability to prove its case—not in the district court's subject-matter jurisdiction over the prosecution. Several of this Court's decisions illustrate the distinction. In *Martin*, *supra*, the defendant asserted that the court lacked jurisdiction over his prosecution for possessing a firearm following a felony conviction, 18 U.S.C. § 922(g)(1), because the government had failed to establish the firearm's nexus to interstate commerce; this Court concluded that—notwithstanding the constitutional import of Section 922(g)'s commerce element—"Martin [wa]s actually attacking the sufficiency of the government's evidence, not the district court's

---

[2] By contrast, in the case on which Young relies (Br. 26-27)—*United States* v. *Adesida*, 129 F.3d 846 (6th Cir. 1997)—this Court considered an indictment alleging "the offense of 'conspiracy to attempt to import'" and correctly noted that "there is no such federal offense." *Id.* at 850. Here, Young does not (and cannot) contend that any of the crimes charged in his indictment are "non-offense[s]." *Ibid.* In any event, the Court in *Adesida* "construed [the indictment] liberally" based on its "reference to the substantive offense provision" and rejected the jurisdictional challenge. *Id.* at 850-51.

authority to have decided the case." 526 F.3d at 933. Similarly, in *Vanwinkle*, *supra*, the defendant contested the court's jurisdiction over his prosecution for access-device fraud, 18 U.S.C. § 1029(a), on the theory that the instrumentality of his fraud did not qualify as an "access device"; this Court affirmed jurisdiction, concluding that the "claim is more properly considered as a legal sufficiency challenge." 645 F.3d at 369. And in *United States* v. *Cor-Bon Custom Bullet Co.*, 287 F.3d 576, 581 (6th Cir. 2002), the defendant argued that "the failure of the indictment to allege affirmative acts of [tax] evasion" under 26 U.S.C. § 7201 "deprived the district court of subject-matter jurisdiction"; this Court, however, "specifically rejected th[at] notion" and recast the challenge as a non-jurisdictional objection to the adequacy of the indictment. Thus, at every turn, this Court has declined to accord jurisdictional import to legal and evidentiary challenges to the constituent elements of federal offenses.

That distinction holds even greater force in this case, as Young challenges the indictment's characterization of a statutory *exemption*—the "except as authorized" clause—rather than any element of the offense. When enacting the CSA, Congress made clear that "[i]t shall not be necessary for the United States to negative any exemption or exception set forth in this subchapter in any complaint, information, indictment, or other pleading or in any trial." 21 U.S.C. § 885(a)(1). The Supreme Court has likewise confirmed that, "in a prosecution under the [CSA], the Government need not refer to a lack of authorization (or any other exemption or exception) in the criminal indictment." *Ruan* v. *United States*, 597 U.S. 450, 462 (2022). The scope and

applicability (*vel non*) of the CSA's authorization exemption—which need not even be pleaded—are thus irrelevant to the district court's subject-matter jurisdiction.

Moreover—even if the absence of authorization were construed as an element of the offense, and even if Young could show that the indictment misstated that element—such a defect in the charging instrument would still not vitiate subject-matter jurisdiction. The Supreme Court long ago "departed from [the] view that indictment defects are 'jurisdictional'" and has confirmed instead that "defects in an indictment do not deprive a court of its power to adjudicate a case." *Cotton*, 535 U.S. at 630-31. This Court has followed suit, "reject[ing] the notion that the failure of an indictment to allege an element of an offense charged prevents a district court from having subject-matter jurisdiction over the indictment." *Cor-Bon*, 287 F.3d at 581; *see also United States* v. *Hobbs*, 953 F.3d 853, 856-57 (6th Cir. 2020) (relying on *Cotton* and *Cor-Bon* to "reject[] the notion that an indictment's failure to allege the 'knowledge-of-status' element required by [intervening caselaw] deprives the court of jurisdiction").

Young's interpretation of the CSA might support a range of potential challenges, including to the adequacy of the indictment, the soundness of the jury instructions, and the sufficiency of the government's evidence. But none of those bear on the district court's subject-matter jurisdiction. And—because Young neither preserved below nor developed on appeal any non-jurisdictional claims—he has "'abandon[ed] all [those] issues.'" *Newsom*, 452 F.3d at 607. This Court need proceed no further.

### D. Congress Has "Authorized" Medical Professionals to Prescribe and Dispense Controlled Substances Only for a Legitimate Medical Purpose in the Usual Course of Their Professional Practice.

In the event this Court reaches the merits of Young's CSA-based challenge, it should find them lacking. The Supreme Court has held that the CSA's "scheme … reveals an intent to limit a registered physician's dispensing authority to the course of his 'professional practice.'" *Moore*, 423 U.S. at 139-40; *see also Nigro* v. *United States*, 276 U.S. 332, 340 n.1 (1928) (concluding that criminal liability under the CSA's predecessor statute was "not to apply to the dispensing of the drug to a patient by a registered physician or practitioner in the course of his professional practice for legitimate medical purposes"). The rule that prescriptions "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice," 21 C.F.R. § 1306.04(a), is simply the Executive Branch's effectuation of that judicial interpretation of an Act of Congress. Because that standard flows directly from Supreme Court decisions interpreting the statutory language, Young's contentions about intervening developments in the law of agency deference have no relevance here.

### 1. Young's Interpretation of the Controlled Substances Act Is Foreclosed by Supreme Court Precedent.

In *United States* v. *Moore*, the Supreme Court confirmed that licensed medical professionals may be subject to criminal liability under the CSA "when their activities fall outside the usual course of professional practice." 423 U.S. at 124. That decision—which interpreted the text, structure, history, and purpose of the statute itself, not any

implementing regulation—forecloses Young's theory that medical professionals enjoy categorical immunity for their drug-dealing activity.

    **a.**    In 1914, Congress enacted the Harrison Anti-Narcotic Act, Pub. L. No. 63-223, 38 Stat. 785, which "provide[d] for the registration of … all persons who … dispense, sell, distribute, or give away opium or coca leaves, their salts, derivatives, or preparations," *ibid.* Lawful distribution of opium or coca "to a patient by a [registered] physician" could occur "in the course of his professional practice only." *Id.* at 786.

Within a decade, the Supreme Court was asked to decide whether a registered physician who dispensed opium pursuant to a prescription could nevertheless face criminal liability under the Harrison Act. *See Jin Fuey Moy* v. *United States*, 254 U.S. 189, 191-92 (1920), overruled in part on other grounds by *Funk* v. *United States*, 290 U.S. 371 (1933). The Court answered in the affirmative, holding that even a licensed doctor "may take a principal part in a prohibited sale of an opium derivative … by unlawfully issuing a prescription to the would-be purchaser." *Id.* at 192. Turning to the question whether that defendant's prescribing practices crossed the threshold of criminal liability, the Court explained that the Harrison Act "confine[d] the immunity of a registered physician … strictly within the appropriate bounds of a physician's professional practice." *Id.* at 194. A physician who, by contrast, prescribed controlled substances "to a dealer" or who "intended to cater to the appetite or satisfy the craving of one addicted to the use of the drug" was subject to prosecution. *Ibid.* Finding, *inter alia*, that the defendant's treatment directives were "not according to the usual practice of

medical men," the Court held that his prescriptions were issued "not in the ordinary course of professional practice"—and, thus, in violation of law.  *Id.* at 193.

The Court's later cases reflected similar analyses of the "appropriate bounds of a physician's professional practice."  *See United States* v. *Behrman*, 258 U.S. 280, 287 (1922) ("Former decisions of this court have held that the purpose of the exception is to confine the distribution of these drugs to the regular and lawful course of professional practice."); *see also, e.g.*, *Linder* v. *United States*, 268 U.S. 5, 17 (1925) (finding indictment insufficient to state a Harrison Act offense where it failed to "allege that [the defendant] dispensed the drugs otherwise than to a patient in the course of his professional practice or for other than medical purposes").  In determining whether a prescription had issued "in the course of [the physician's] professional practice," the jury considered "whether [the prescribed medication] conformed to medical standards, and, if it was in excess of such standards, whether there was reason or occasion for the excess."  *Boyd* v. *United States*, 271 U.S. 104, 106-07 (1926).

**b.**    In 1970, "prompted by a perceived need to consolidate the growing number of piecemeal drug laws and to enhance federal drug enforcement powers," *Gonzales* v. *Raich*, 545 U.S. 1, 12 (2005), Congress passed the Controlled Substances Act, Pub. L. No. 91-513, 84 Stat. 1236.  "Congress was particularly concerned with the need to prevent the diversion of drugs from legitimate to illicit channels" and thus "devised a closed regulatory system making it unlawful to … distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA."  *Raich*, 545 U.S. at 12.

That "authoriz[ation]"—embodied in a regulation promulgated by the Attorney General—incorporated the inquiry that the Supreme Court had used repeatedly in the Harrison Act cases. Specifically, the regulation replicated the requirement that every prescription for a controlled substance "be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 306.04(a) (1973); *accord Nigro*, 276 U.S. at 340 n.1 (providing a safe harbor for "the dispensing of the drug … by a registered physician or practitioner in the course of his professional practice for legitimate medical purposes").

c.    Shortly thereafter, the Supreme Court held in *Moore* that the CSA retained the Harrison Act's imposition of criminal liability for physicians who prescribe outside the accepted bounds of medical practice. The Court began by repeating its holding in *Jin Fuey Moy, supra*, that "[p]hysicians who stepped outside the bounds of professional practice could be prosecuted under the Harrison Act." *Moore*, 423 U.S. at 132. "In enacting the CSA," the Court observed, "Congress attempted to devise a more flexible penalty structure" than that provided by the Harrison Act. *Ibid.* But the Court found it "unlikely that Congress [sought] … to carve out a major new exemption, not found in the Harrison Act, for physicians and other registrants," particularly given that the CSA "was intended to 'strengthen,' rather than to weaken, 'existing law enforcement authority in the field of drug abuse.'" *Id.* at 132-33. That statutory objective— combined with numerous "[o]ther provisions" of the statute requiring that drugs be dispensed and obtained only for a "'currently accepted medical use'" and in "'the lawful

course of … professional practice,'" *id.* at 141-42—demonstrated Congress's intent that the CSA carry forward the same standard of liability approved in Harrison Act cases. *Cf. Forest Grove Sch. Dist.* v. *T.A.*, 557 U.S. 230, 239 (2009) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute."). The Court thus determined that "Congress was concerned with the nature of the drug transaction, rather than with the status of the defendant," *Moore*, 423 U.S. at 134, and again intended "to confine authorized medical practice within accepted limits," *id.* at 141-42.

      **d.**    Young's novel reading of the CSA to confer categorical immunity on licensed medical professionals is irreconcilable with this unbroken line of Supreme Court precedent. He contends (Br. 32) that the indictment treats the authorization provided under 21 U.S.C. § 841(a) as "a *conditional* authorization" that depends on the distribution "being for a legitimate medical purpose" and within the usual course of professional practice. Fair enough: As the Supreme Court held in *Moore*, "[i]mplicit in the registration of a physician is the understanding that he is authorized only to act 'as a physician,'" which necessarily "contemplates that he is authorized by the State to practice medicine and to dispense drugs in connection with his professional practice … within 'the legitimate distribution chain.'" 423 U.S. at 141. These features of the statutory scheme "reflect the intent of Congress to confine authorized medical practice within accepted limits." *Id.* at 141-42. Accordingly, the "condition" to which Young objects (Br. 32) was not invented by the Attorney General, the district court, or the grand jury—it was imposed by the CSA, as interpreted by the Supreme Court.

Young is, of course, free to file a petition for a writ of certiorari asking the Court

to revisit the consistent interpretation of the Nation's drug laws it has maintained for

more than a century. But "until and unless" he persuades the Supreme Court of that

proposition, this Court is "bound by the Supreme Court's statements" in *Moore*, which

foreclose Young's claim of immunity. *United States* v. *Watford*, 468 F.3d 891, 915 (6th

Cir. 2006); *cf. Hrometz* v. *Loc. 550, Int'l Ass'n of Bridge Const. & Ornamental Ironworkers*, 227

F.3d 597, 602 (6th Cir. 2000) (Even where the Supreme Court's "interpretation … is

technically dicta, its import is clear and therefore binding upon this [C]ourt.").[3]

---

[3] Amicus contends (Br. 11) that *Moore* has been "impliedly abrogated" by subsequent case law on agency deference. That argument fails for at least five reasons. First, the Supreme Court has—repeatedly and recently—cited *Moore* as supplying the applicable standard of criminal liability in unlawful-prescribing cases. *See, e.g.*, *Ruan*, 597 U.S. at 466; *Gonzales* v. *Oregon*, 546 U.S. 243, 269 (2006); *Raich*, 545 U.S. at 31 & n.40. Second, as discussed *infra* pp. 41-43, agency deference played no role in the *Moore* Court's analysis, so the abrogation of *Chevron* deference is of no moment here. Third, even if *Moore* had involved agency deference, the Supreme Court made clear that it was *not* overruling the decades of decisions applying such deference. *See Loper Bright*, 603 U.S. at 412 ("[W]e do not call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful … are still subject to statutory *stare decisis* despite our change in interpretive methodology."). Fourth, this Court may not presume that a precedent of the Supreme Court is no longer authoritative until the Justices have said so themselves. *See Mallory* v. *Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) ("'If a precedent of th[e Supreme] Court has direct application in a case,' … a lower court 'should follow the case which directly controls, leaving to th[e Supreme] Court the prerogative of overruling its own decisions.' … This is true even if the lower court thinks the precedent is in tension with 'some other line of decisions.'"). And fifth, Young has not challenged *Moore*'s ongoing vitality, and an amicus "'may not raise additional issues or arguments not raised by the parties.'" *Self-Ins. Inst. of Am., Inc.* v. *Snyder*, 827 F.3d 549, 560 (6th Cir. 2016) ("'To the extent that the amicus raises issues or makes arguments that exceed those properly raised by the parties, we may not consider such issues.'").

### 2.    Questions of Judicial Deference to Agency Interpretations Have No Bearing on This Prosecution.

Attempting to sidestep the plain import of *Moore*, Young offers an extended disquisition (Br. 38-47) on the Administrative Procedure Act (APA), the rise and fall of *Chevron* deference, the major-questions and nondelegation doctrines, and other supposed trends in Supreme Court jurisprudence.  None of that is relevant here.

**a.**    *Chevron* adopted a two-step framework to interpret statutes administered by federal agencies:  First, courts must assess "whether Congress has directly spoken to the precise question at issue" (and, if so, end the inquiry); second, they must defer to the agency's interpretation if it "is based on a permissible construction of the statute." 467 U.S. at 842-43.  In *Loper Bright Enterprises* v. *Raimondo*, the Court overruled *Chevron* and held that "courts must exercise independent judgment in determining the meaning of statutory provisions" without deferring to agencies.  603 U.S. 369, 394-96 (2024).

The Supreme Court did not apply *Chevron* deference in *Moore*—which predated *Chevron* by nine years.  Nor did *Moore* commit, under some other label, *Chevron*'s "grave[] err[or]" as identified by *Loper Bright*:  "concluding that the inquiry is fundamentally different just because an administrative interpretation is in play."  603 U.S. at 401.  To the contrary, the *Moore* Court "exercis[ed its] independent legal judgment" informed by "the traditional tools of statutory construction."  *Ibid.*; *see also United States* v. *You*, 74 F.4th 378, 397 (6th Cir. 2023) ("[T]he 'traditional tools' of construction" comprise the provision's "'text, structure, history, and purpose.'").  Specifically, *Moore* analyzed:

- the <u>text</u> of the CSA, *see* 423 U.S. at 131-32 ("[T]he statutory language cannot fairly be read to support the view that all activities of registered physicians are exempted from the reach of [Section] 841 simply because of their status"); *see also id.* at 140-41;

- the overall <u>structure</u> of the statutory scheme, *see id.* at 141-42 ("Other provisions throughout the Act reflect the intent of Congress to confine authorized medical practice within accepted limits.");

- the CSA's <u>history</u> as a successor statute to the Harrison Act, *see id.* at 132 ("[Moore's reading] would constitute a sharp departure from prior laws," since "[p]hysicians who stepped outside the bounds of professional practice could be prosecuted under the Harrison Act …, the predecessor of the CSA."); and

- the express <u>purpose</u> for which the CSA was adopted, *see ibid.* ("[T]he Act was intended to 'strengthen,' rather than to weaken, 'existing law enforcement authority in the field of drug abuse.'").[4]

---

[4] Amicus appears to misunderstand this passage, asserting (Br. 13) that "*Moore* went 'beyond the statute's text,' … and into legislative history and legislative intent." In fact, the Court was quoting the enacted statutory preamble. *See* 84 Stat. 1236. That provision "is *legislation*, not legislative history. It was written, debated, and enacted by Congress and signed into law by the President—in the same manner and at the same time as [the rest of the Act]. None of the standard objections to judicial reliance on legislative history inhibit [this Court's] resort to a *statutory* declaration of purpose for help in interpreting a part of the statute to which it applies." *Rubin* v. *Islamic Republic of Iran*, 830 F.3d 470, 480 (7th Cir. 2016), aff'd, 583 U.S. 202 (2018).

Equally notable, for present purposes, is what *Moore* did *not* do: defer in any way to the Attorney General's interpretation of the CSA. The Court could easily have done so—the Attorney General had, by that time, promulgated the regulation that would become 21 C.F.R. § 1306.04, which the Court acknowledged in a footnote. *See Moore*, 423 U.S. at 136 n.12 (quoting 21 C.F.R. § 306.04(a) (1973)). But no part of the Court's opinion extended any deference to the Attorney General's views. The Court instead sought to identify the CSA's "best meaning," as "discern[ed] by … deploying [the] full interpretive toolkit." *Loper Bright*, 603 U.S. at 408-09.

In short, Young's theory is foreclosed by *Moore*, which had nothing to do with *Chevron*. *Loper Bright*'s overruling of *Chevron* thus neither unsettles *Moore* nor helps Young.[5]

**b.**     Young discusses at length (Br. 36-37, 42-44) the Supreme Court's decision in *Gonzales* v. *Oregon*, *supra*, but—to the extent that case has any relevance here—it supports the government.

In *Gonzales*, the Court concluded that the CSA does not allow the Attorney General "to prohibit doctors from prescribing regulated drugs for use in physician-assisted suicide" where "state law permit[s] the procedure." 546 U.S. at 248-49. In so

---

[5] Young's cursory argument (Br. 46) that the "overturn[ing]" of *Auer* v. *Robbins*, 519 U.S. 452 (1997), deprives the court of subject-matter jurisdiction fails for a similar reason—the government has not invoked *Auer* deference in support of a standard taken directly from Supreme Court precedent—plus the additional reason that *Auer* was recently *reaffirmed*, not overruled. *See Kisor* v. *Wilkie*, 588 U.S. 558, 580-85 (2019).

holding, the Court confirmed that 21 C.F.R. § 1306.04 is a faithful—indeed, nearly verbatim—encapsulation of the standard Congress enacted in the CSA itself. *Id.* at 257 ("The regulation us[ing] the terms 'legitimate medical purpose' and 'the course of professional practice' … just repeats two statutory phrases."). And the Court accordingly did not apply any species of deference to the Attorney General's interpretation of the CSA, *id.* at 258, 268—confirming that the demise of *Chevron* has no bearing on this case, *see supra* pp. 41-43.

Young seizes (Br. 42) on the Court's aside that "the statutory phrase 'legitimate medical purpose' is a generality, susceptible to more precise definition and open to varying constructions, and thus ambiguous in the relevant sense." *Gonzales*, 546 U.S. at 258. But this Court has repeatedly held that "the question of what constitutes 'the usual course of professional practice' [is] for a jury to sort out," *United States* v. *Volkman*, 797 F.3d 377, 385 (6th Cir. 2015), and "a jury is entitled to use its lay understanding of what drug distributions are clearly illegitimate" in rendering that assessment, *Elliott*, 876 F.3d at 864. As then-Judge Gorsuch explained in similar circumstances:

> *Gonzales* does not apply to our case. Unlike *Gonzales*, we have before us no interpretive rule seeking to define a practice as lacking any legitimate medical purpose[.] … Instead, in this case the government sought to establish that the conduct of the [prescribing] physicians was inconsistent with the usual course of professional practice the old-fashioned way: through witnesses and documentary proof at trial focused on the contemporary norms of the medical profession. Unlike *Gonzales* as well, [the defendant] wasn't foreclosed by rule from disagreeing; instead, he was free at all times to present contrary proof that his behavior and those of the … prescribing physicians *were* consistent with the usual course of professional practice. And, again unlike *Gonzales*, the jury here remained

> free to sort out all the competing proof: the question what constitutes usual medical practice remained, at all times, within its province, not the Attorney General's.

*United States* v. *Lovern*, 590 F.3d 1095, 1100 (10th Cir. 2009) (Gorsuch, J.). Accordingly, there is no "need for rulemaking to define" (Br. 42) this necessarily context-dependent standard that courts and juries have managed to apply for decades.

To the extent Young implies some sort of vagueness or fair-notice defect, any such concerns are obviated by the Supreme Court's recent decision in *Ruan*, *supra*. There, the Court held that it is not "sufficient for the Government to prove that a prescription was *in fact* not authorized" but also necessary to "prove that the doctor *knew* or *intended* that the prescription was unauthorized." 597 U.S. at 455. Consistent with that decision, the district court instructed the jury to determine whether Young "knew or intended that the prescriptions at issue were not written for a legitimate medical purpose … in the usual course of professional practice." Jury Instructions, R. 284, PageID #4023; *see also id.* at #4024 (instructing jury on "good faith" defense). Through its verdicts, the jury thus made clear that Young not only transgressed the bounds of accepted medical practice but did so with awareness of his culpability.[6]

---

[6] Young also claims that "the Attorney General … did not comply with the APA in crafting the definition of 'legitimate medical purpose.'" Br. 38 (capitalization altered). As noted, however, the bounds of "professional practice" and "legitimate medical purpose" are questions for the jury, not matters "defin[ed]" by the Attorney General. In any event, the Attorney General has promulgated all CSA regulations—including 21 C.F.R. § 1306.04—in compliance with the APA. *See* 36 Fed. Reg. 4948 (Mar. 13, 1971) (notice-and-comment rulemaking for the original version of the regulation, 21 C.F.R. § 306.04).

**c.**     Young gestures (Br. 45-46) at the nondelegation and major-questions doctrines in support of his contention that the district court lacked subject-matter jurisdiction over this case.  But for essentially the same reasons that *Chevron* and *Loper Bright* are immaterial here, those doctrines also do not apply.

Under the nondelegation doctrine, "a statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Gundy* v. *United States*, 588 U.S. 128, 135 (2019) (plurality opinion).  "Given that standard, a nondelegation inquiry always begins (and often almost ends) with statutory interpretation." *Ibid.*  But where, as here, "there was no delegation of congressional power" in the first place, "the federal nondelegation doctrine" does not apply.  *Rice* v. *Vill. of Johnstown, Ohio,* 30 F.4th 584, 588 (6th Cir. 2022); *see also Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin* v. *United States*, 367 F.3d 650, 659 (7th Cir. 2004) ("We conclude that the nondelegation doctrine is not implicated … because [the statute] does not delegate any legislative power[.]").  As discussed, the Supreme Court has held that the *CSA itself* embodies the requirement that authorized persons dispense controlled substances only for legitimate and accepted medical purposes.  Because that standard reflects *Congress's*—rather than any Executive Branch delegee's—"intent to limit a registered physician's dispensing authority to the course of his 'professional practice,'" *Moore*, 423 U.S. at 140, "there was no delegation of congressional power" that could conceivably implicate the nondelegation doctrine, *Rice,* 30 F.4th at 588.

46

In certain "extraordinary cases," the major-questions doctrine requires that an agency "point to 'clear congressional authorization' for the power it claims." *W. Virginia* v. *Env't Prot. Agency*, 597 U.S. 697, 721-23 (2022). As with the nondelegation doctrine, however, a prerequisite to application of this doctrine is the agency's assertion of delegated authority. *See id.* at 724 (doctrine implicated only when "agencies [have] assert[ed] highly consequential power beyond what Congress could reasonably be understood to have granted"). For the reasons already discussed, no delegation of legislative power—major, minor, or otherwise—was effected here. Rather, Congress explicitly adopted the "usual course of medical practice" standard into the CSA's predecessor statute, *see Moore*, 423 U.S. at 139, and the Supreme Court then interpreted the CSA to incorporate that standard in the context of authorized dispensing by medical professionals, *id.* at 140-42. To the extent that "confin[ing] authorized medical practice within accepted limits," *id.* at 142, constitutes a "major question," it is one that was already answered by Congress and the Supreme Court—not the Attorney General.

Finally, if either doctrine were implicated, Section 1306.04 would easily pass muster. In 21 U.S.C. § 821, Congress "authorized" the Attorney General "to promulgate rules and regulations … relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances." The CSA could hardly have granted "'clear[er] congressional authorization,'" *W. Virginia*, 597 U.S. at 723, for the Attorney General to "regulat[e] … the dispensing of controlled substances." And, as the Court held in *Moore*, the CSA evinces "the intent of Congress

to confine authorized medical practice within accepted limits," 423 U.S. at 141-42—thereby supplying the "'intelligible principle to which the [Attorney General] … [wa]s directed to conform'" when promulgating those regulations, *Gundy*, 588 U.S. at 135. The rule restricting the dispensation of controlled substances by medical professionals to "prescription[s] … issued for a legitimate medical purpose … in the usual course of … professional practice," 21 C.F.R. § 1306.04(a), is thus authorized by clear statutory directive, consistent with the Supreme Court's elucidation of congressional intent, and borrowed from a century's worth of judicial precedents interpreting the Nation's drug laws.  Even if some doctrine of delegation or deference applied here, the Attorney General's rule appropriately executes—not arrogates—Congress's command.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment below.

Respectfully submitted,

MATTHEW R. GALEOTTI
*Supervisory Official*

*s/Joshua K. Handell*

KATHERINE PAYERLE            JOSHUA K. HANDELL
*Deputy Chief*               *Attorney, Appellate Section*
                             *Criminal Division, Ste. 1515*
ANDREW PENNEBAKER            *United States Department of Justice*
*Trial Attorney*             *950 Pennsylvania Avenue N.W.*
*Criminal Division, Fraud Section*   *Washington, DC 20530*
                             *(202) 305-4244*
                             *joshua.handell@usdoj.gov*

March 10, 2025

## SUPPLEMENTAL DESIGNATION OF DISTRICT COURT RECORD

In addition to the entries designated by Young, the government designates the following excerpts from the district court record:

| Dkt. No. | Document | PageID # |
|---|---|---|
| 4 | Indictment | 19-33 |
| 275 | Trial Tr. (Day 2 A.M.) | 3237-41, 3263-67, 3275-76, 3288, 3305-06, 3312-21, 3325-30, 3342-57, 3365-66 |
| 276 | Trial Tr. (Day 2 P.M.) | 3391, 3404-64, 3474, 3491-93, 3499-3502 |
| 277 | Trial Tr. (Day 3 A.M.) | 3521-22, 3592, 3595-96 |
| 278 | Trial Tr. (Day 3 P.M.) | 3641, 3652, 3674, 3685, 3691, 3710, 3729-34, 3749, 3752-53, 3761, 3779 |
| 281 | Trial Tr. (Day 4 A.M.) | 3786-96, 3839-45, 3862-76 |
| 282 | Trial Tr. (Day 4 P.M.) | 3908-25, 3970-82 |
| 284 | Jury Instructions | 4023-24 |
| 285 | Verdict | 4031-34 |
| 343 | Judgment | 5737-40 |

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,917 words (excluding those portions exempted by Rule 32(f)), as verified by the word-count feature of Microsoft Word.

2.      This brief complies with the type-size and type-face requirements of Rules 32(a)(5) and (6) because it has been prepared in 14-point Garamond font.

3.      This brief has been scanned for viruses with the most recent version of McAfee Endpoint Security, version 10.50, which is continuously updated, and according to that program, is free of viruses.

*s/Joshua K. Handell*
Joshua K. Handell
*Attorney, Appellate Section*
*Criminal Division, Ste. 1515*
*United States Department of Justice*
*950 Pennsylvania Avenue N.W.*
*Washington, DC 20530*
*(202) 305-4244*
*joshua.handell@usdoj.gov*

# CERTIFICATE OF SERVICE

I certify that on March 10, 2025, I caused the foregoing brief to be served upon

the filing users identified below through the Court's CM/ECF system:

Claiborne H. Ferguson
The Claiborne Ferguson Law Firm, P.A.
294 Washington Avenue
Memphis, TN 38103
(901) 529-6400
claiborne101@yahoo.com

*Counsel for Defendant-Appellant Jeffrey Young, Jr.*

Jerry Gonzalez
Law Office of Jerry Gonzalez
8000 Hwy 99, No. 456
Rockvale, TN 37153
(615) 360-6060
jgonzalez@jglaw.net

*Counsel for Amicus Curiae Bowdoin Smith*

s/Joshua K. Handell
JOSHUA K. HANDELL
*Attorney, Appellate Section*
*Criminal Division, Ste. 1515*
*United States Department of Justice*
*950 Pennsylvania Avenue N.W.*
*Washington, DC 20530*
*(202) 305-4244*
*joshua.handell@usdoj.gov*